1   Sean T. Malone (OR Bar No. 084060)
    Attorney at Law
2   259 E. 5th Ave., Ste. 200-C
    Eugene, OR 97401
3   Tel. (303) 859-0403
    seanmalone8@hotmail.com
4
    Mike Sargetakis (OR Bar No. 174607)
5   mike@oxbowlaw.com
    Doug Hageman (OR Bar No. 173654)
6   doug@oxbowlaw.com
    Oxbow Law Group LLC
7   735 SW 1st Ave, Ste 200
    Portland OR 97204
8   Tel. (503) 694-9361

9   Karl G. Anuta (OR Bar No. 861423)
    Law Office of Karl G. Anuta PC
10  735 SW 1st Ave, 2nd Fl.
    Portland, OR 97204
11  Tel. (503) 827-0320
    kga@integra.net
12
    *Attorneys for Plaintiffs*
13

14              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF OREGON
15                    PORTLAND DIVISION

16  NO MORE FREEWAYS, NEIGHBORS FOR        Case No.:  3:21-cv-498
    CLEAN AIR, and ELIOT NEIGHBORHOOD
17  ASSOCIATION,                           COMPLAINT FOR DECLARATORY
                                           AND INJUNCTIVE RELIEF
18                    Plaintiffs,
        v.                                 (National Environmental Policy Act, 42
19                                         U.S.C. §§ 4321 *et seq.*, Administrative
    UNITED STATES DEPARTMENT OF            Procedure Act, 5 U.S.C. §§ 701 *et seq.*, U.S.
20  TRANSPORTATION, UNITED STATES          Department of Transportation Act, 49 U.S.C.
    FEDERAL HIGHWAY ADMINISTRATION,        § 303(c))
21  and THOMAS D. EVERETT, Administrator of
    the Federal Highway Administration,
22
                      Defendants.
23

24
    COMPLAINT                                                              1

1              **STATEMENT OF THE CASE**

2       1.   Defendants United States Department of Transportation ("DOT") and the United

3    States Federal Highway Administration ("FHWA") approved the Interstate 5 ("I-5") Rose

4    Quarter Improvement Project ("Project") by issuing the Finding of No Significant Impact

5    ("FONSI") and Revised Environmental Assessment ("REA") for the Project.  The Project

6    was prepared in conjunction with the Oregon Department of Transportation ("ODOT").  The

7    Project is located in Portland, Oregon, on I-5 between Interstate 405 (I-405) and Interstate 84

8    (I-84), the Broadway/Weidler interchange, and on adjacent surface streets in the vicinity of

9    Broadway/Weidler interchange.

10   

1    As part of the Project's actions, Defendants, in conjunction with ODOT, plan to construct

2    new auxiliary lanes and full shoulders between I-84 to the south and I-405 to the north, in

3    both southbound and northbound directions, as well as re-striping the I-5 mainline to provide

4    the I-5 southbound auxiliary lane between the I-84 off-ramp and the Morrison Bridge/SE

5    Portland/Oregon Museum of Science and Industry off-ramp.  Removal, and in some cases

6    reconstruction, of structures over I-5 would occur.

7         2.   Urban freeways have significant impacts on the cities in which they exist, and the

8    Project will have a significant impact on the City of Portland and its residents at the

9    tremendous cost of almost $800 million, despite the existence of fiscally conservative

10   alternatives that can satisfy the Project's purposes and needs.

11        3.   Plaintiffs allege that, in approving the Project, Defendants have violated the

12   National Environmental Policy Act ("NEPA") and the regulations implementing NEPA

13   within the meaning of the Administrative Procedure Act ("APA"), as well as section 4(f) of

14   the U.S. Department of Transportation Act ("Transportation Act") within the meaning of the

15   APA.

16        4.   Plaintiffs seek relief declaring Defendants' approval of the Project violates

17   NEPA, the Transportation Act, and the APA, an order vacating the FONSI and REA and

18   remanding the matter, an order requiring Defendants to prepare an EIS, and an order

19   enjoining Defendants from implementing the Project pending further review of the Project

20   and compliance with all applicable provisions of law.

21                                **JURISDICTION**

22        5.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331(a) (action for declaratory

23   and injunctive relief arising under the Constitution and laws of the United States); 28 U.S.C.

24

COMPLAINT                                                                3

1    §§ 2201, 2202 (power to issue declaratory or injunctive relief in cases of actual controversy);

2    and 5 U.S.C. §§ 702-706, because (1) the action arises under the laws of the United States,

3    (2) each Defendant is sued in its official capacity, and (3) there is a present, actual and

4    justiciable controversy between the parties.

5        6.   Plaintiffs commented on the Draft Environmental Assessment (DEA), as well as

6    engaged with the FHWA and ODOT at every opportunity afforded the public.  In so doing,

7    Plaintiffs have exhausted all administrative remedies available to them as required by the

8    APA.  The challenged agency action is final and subject to this Court's review pursuant to 5

9    U.S.C. §§ 702, 704, and 706.  Some of Plaintiffs also submitted a letter requesting

10   supplemental analysis under NEPA.

11                                              **VENUE**

12       7.   Venue properly rests in the District of Oregon pursuant to 28 U.S.C. § 1391(e)

13   and 5 U.S.C. § 703 (APA) because all or a substantial part of the events or omissions giving

14   rise to the claims herein occurred within this judicial district and the agency records in

15   question are located in this district.  This case is filed properly in Portland, Oregon pursuant

16   to Local Rule 3.2.

17                                             **PARTIES**

18       8.   Plaintiff No More Freeways is an association of individuals and organizations in

19   the State of Oregon dedicated to reducing the impact of urban freeways on climate change,

20   air quality and urban quality of life.  No More Freeways' members make the community

21   aware of adverse impacts of urban freeway expansions and advocate for responsible

22   alternatives.  The organization's membership includes many individuals who live, work, go

23   to school and recreate in the impact area of this project, the I-5 corridor generally, and the

24

COMPLAINT                                                                                    4

1    Portland metropolitan regional freeway network.  No More Freeways' members pursue, and

2    have concrete plans to continue pursuing the aforementioned activities, as well as a reduction

3    of community impacts from urban freeways and freeway expansions.  These intersections of

4    No More Freeway and its members are substantial and are adversely affected by Defendants'

5    failure to comply with NEPA.  The requested relief will redress the injuries of No More

6    Freeways and its members.

7         9.   Plaintiff Neighbors for Clean Air is an Oregon environmental nonprofit

8    advocating for better air quality in Oregon with an emphasis on public health, and

9    empowering Oregonians with information and tools to ensure everyone breathes clean air.

10   Plaintiff Neighbors for Clean Air has more than three thousand members, the majority of

11   whom live in the state of Oregon and many of whom participate in advocacy for the

12   improvement of local air quality. Some of these members live, work, and play in the area

13   affected by the expansion of the I-5 freeway, or teach or have children attending Harriet

14   Tubman Middle School, which is directly adjacent to the freeway. Conducting extended

15   construction and increasing traffic, without first conducting a full environmental impact

16   statement, affects our ability to protect community health and provide information about risk

17   to our members. These intersections of Neighbors for Clean Air and its members are

18   substantial and are adversely affected by Defendants' failure to comply with NEPA.  The

19   requested relief will redress the injuries of Neighbors for Clean Air and its members.

20        10. Plaintiff Eliot Neighborhood Association is a neighborhood association and

21   nonprofit in the State of Oregon, dedicated to achieving a better environment, better physical

22   accommodations, and an improved quality of urban life for our residents. Eliot Neighborhood

23   Association's members participate by meeting to discuss private and public projects affecting

24

COMPLAINT                                                                              5

1    the neighborhood. The organization's membership includes all people who live or work

2    within our boundaries who consent to being members. Eliot Neighborhood Association

3    members, and board members pursue, and have concrete plans to continue pursuing,

4    reducing diesel pollution in the neighborhood, reducing vehicle miles travelled through the

5    neighborhood, encouraging the welfare of our community, encouraging immediate

6    development of underused properties in the area, encouraging transit use through the area,

7    encouraging bicycle transportation and other non-car uses, improving public trust in

8    government spending through fiscal responsibility, improving urban design and striving to

9    accomplish the goals in Portland's Comprehensive plan and other goals. These intersections

10   of Eliot Neighborhood Association and its members are substantial and are adversely

11   affected by Defendants' failure to comply with the NEPA. The requested relief will redress

12   the injuries of Eliot Neighborhood Association and its members.

13        11. Defendant United States Department of Transportation ("DOT") is a cabinet level

14   agency of the United States Government and its principal place of business is located at 1200

15   New Jersey Avenue, SE, Washington, DC 20590.  DOT is the executive department of the

16   federal government responsible for approval of federally funded highway projects.

17        12. United States Federal Highway Administration ("FHWA") is an operating

18   administration of DOT, and its principal place of business is located at 1200 New Jersey

19   Avenue, SE, Washington, DC 20590.  FHWA is the administration primarily responsible for

20   highway planning and funding.  FHWA, through its Oregon Division and in conjunction with

21   ODOT, prepared, reviewed and approved the DEA, FONSI, and REA.

22        13. Thomas D. Everett is the chief executive officer and administrator of the FHWA.

23   He is responsible for the administration, operations, and activities of FHWA and its various

24

COMPLAINT                                                                          6

1    divisions.  Administrator Everett maintains his office at 1200 New Jersey Avenue, SE,

2    Washington, DC 20590.  Administrator Everett is sued in his official capacity.

3                                    **GOVERNING LAW**

4                         **The National Environmental Policy Act (NEPA)**

5              14. NEPA is the so-called Magna Carta of American environmental law, and it

6    embodies our Nation's environmental conscience.  Congress issued a fundamental

7    declaration of values, including a call to action that focused on the protection of human

8    health and the environment in all federal agencies.

9              15. NEPA has twin aims.  First, NEPA requires federal agencies to consider every

10   significant aspect of the environmental impact of a proposed action. Second, NEPA ensures

11   that the agency will inform the public that it has indeed considered environmental concerns

12   in its decision-making process.

13             16. According to 40 C.F.R. § 1502.1 (2019), the primary purpose of a NEPA analysis

14   is to serve as an action-forcing device to insure that the policies and goals defined in NEPA

15   are infused into the ongoing programs and actions of the Federal Government.

16             17. NEPA procedures must insure that environmental information is available to

17   public officials and citizens before decisions are made and before actions are taken.

18   Accurate scientific analysis, expert agency comments, and public scrutiny are essential to

19   implementing NEPA, pursuant to 40 C.F.R. § 1500.1(b) (2019).

20             18. NEPA and its implementing regulations promulgated by the Council on

21   Environmental Quality ("CEQ") require federal agencies to prepare an environmental impact

22   statement ("EIS") for every recommendation or report on proposals for legislation and other

23   major Federal actions significantly affecting the quality of the human environment, pursuant

24

COMPLAINT                                                                                    7

1    to 42 U.S.C. § 4332(2)(C).  Moreover, for those major Federal actions, agencies must

2    analyze and disclose the environmental impact of the proposed action, any adverse

3    environmental effects which cannot be avoided should the proposal be implemented,

4    alternatives to the proposed action, the relationship between local short-term uses of man's

5    environment and the maintenance and enhancement of long-term productivity, and any

6    irreversible and irretrievable comments of resources which would be involved in the

7    proposed action should it be implemented.  Pursuant to 42 U.S.C. § 4332(E), agencies must

8    study, develop, and describe appropriate alternatives to recommended course of action in any

9    proposal which involves unresolved conflicts concerning alternative uses of available

10   resources.  Pursuant to 40 C.F.R. § 1508.9 (2019), an environmental assessment ("EA") shall

11   include brief discussions of the need for the proposal, of alternatives, and of the

12   environmental impacts of the proposed action and alternatives.

13       19. NEPA requires federal agencies to analyze the direct, indirect, and cumulative

14   impacts of proposed actions, pursuant to 42 U.S.C. § 4332(2)(C)(i)-(ii), 40 C.F.R. §§ 1508.7

15   (2019), 1508.8 (2019).

16       20. On July 16, 2020, during the pendency of the FONSI and REA, the CEQ issued a

17   final rule rewriting the entirety of the agency's regulations implementing NEPA that had

18   been in place since 1978.

19       21. Under the new regulations, NEPA requires that Federal agencies must consider

20   relevant environmental information and ensure that the public has been informed regarding

21   the decision-making process, pursuant to 40 C.F.R. § 1500.1 (2020).  Agencies must identify

22   environmental effects and values in adequate detail so the decision-maker can appropriately

23   consider such effects and values alongside economic and technical analyses, under 40 C.F.R.

24

COMPLAINT                                                                                          8

1    § 1501.2(b)(2) (2020), and agencies must study, develop, and describe appropriate

2    environmental alternatives to recommended courses of action in any proposal that involves

3    unresolved conflicts concerning alternative uses of available resources, pursuant to 40 C.F.R.

4    § 1501.2(b)(3) (2020).

5          22. According to 40 C.F.R. §§ 1501.3(b)(1) and (2) (2020), to determine whether the

6    effects of the proposed action are significant, agencies shall analyze the potentially affected

7    environment and degree of the effects, as well as short- and long-term effects, beneficial and

8    adverse effects, effects on public health and safety, and effects that would violate Federal,

9    State, Tribal, or local law protecting the environment.

10          23. Under 40 C.F.R. § 1501.5(c) (2020), an EA shall briefly provide sufficient

11    evidence and analysis for determining whether to prepare an environmental impact statement

12    or a finding of no significant impact, including a discussion of the purpose and need for the

13    proposed action, alternatives as required by section 102(2)(E) of NEPA, and the

14    environmental impacts of the proposed action and alternatives.  Pursuant to 40 C.F.R. §

15    1508.1(g) (2020), effects or impacts include changes to the human environment from the

16    proposed action or alternatives that are reasonably foreseeable and have a reasonably close

17    causal relationship to the proposed action or alternatives, including those effects that occur at

18    the same time and place as the proposed action or alternatives and may include effects that

19    are later in time or farther removed in distance from the proposed action or alternatives.

20    Effects also include ecological, aesthetic, historic, cultural, economic social, or health effects.

21          24. Under 40 C.F.R. § 1508.1(z) (2020), reasonable alternatives mean a reasonable

22    range of alternatives that are technically and economically feasible, meet the purpose and

23    need for the project, and where applicable, meet the goals of the applicant.

24

COMPLAINT                                                                                            9

1

**The Administrative Procedure Act (APA)**

2      25. The Court's review of plaintiffs' NEPA claims is governed by the APA.

3      26.  Pursuant to 5 U.S.C. § 702, the APA mandates that a person suffering legal

4  wrong because of an agency action, or adversely affected or aggrieved by agency action

5  within the meaning of a relevant statute, is entitled to judicial review thereof.

6      27. Pursuant to 5 U.S.C. §§ 706(2)(A) and (D), the reviewing court shall hold

7  unlawful and set aside agency actions, findings, and conclusions found to be arbitrary,

8  capricious, or an abuse of discretion or otherwise not in accordance with law, or which have

9  been taken without observance of procedure required by law.

10                        **PROCEDURAL BACKGROUND**

11      28. On November 28, 2018, some of Plaintiffs requested an extension of the public

12  comment period, and agencies denied that request on January 11, 2019.

13      29. On February 15, 2019, the agencies issued the Draft Environmental Assessment

14  ("DEA").

15      30. On March 4, 2019, some of Plaintiffs requested that the agencies provide key data

16  that was not included in the DEA and its appendices.  The agencies did not make this

17  requested information (roughly 632 pages) available until March 13, 2019.

18      31. On March 18, 2019, some of Plaintiffs requested an extension to submit

19  comments on the DEA given that the agencies did not provide the public with access to all

20  relevant information for the DEA until well after the DEA was published.  The agencies

21  denied the request for an extension of time to comment on the DEA.

22      32. On March 23, 2019, through a public records request, ODOT released roughly

23  33GB of electronic files containing engineering diagrams and drawings of the Project.

24

COMPLAINT                                                        10

1        33. On March 25, ODOT disclosed traffic modeling assumptions for the Project.

2        34. On April 1, 2019, Plaintiffs and thousands of others submitted comments on the

3 DEA.

4        35. On September 12, 2020, some of plaintiffs sent a letter to the agencies requesting

5 supplemental NEPA analysis based on significant new information.

6        36. On October 15, 2020, FHWA issued a response to the request to prepare

7 supplemental NEPA analysis, indicating that the agencies would respond to the letter within

8 the Revised Environmental Assessment ("REA").

9        37. On October 30, 2020, the agencies issued the FONSI and REA for the Project.

10        38. On November 6, 2020, the Federal Register published the Notice of Final Federal

11 Agency Actions on I-5 Rose Quarter Improvement Project in the City of Portland,

12 Multnomah County, Oregon.

13 **FIRST CLAIM FOR RELIEF**

14 **Violation of NEPA and the APA**

15 **Count I**

16 **Failure to Prepare an Environmental Impact Statement**

17        39. Plaintiffs incorporate by reference ¶¶ 1-38.

18        40. NEPA, specifically 42 U.S.C. § 4332(2)(C), requires agencies to prepare an EIS

19 for all major federal actions significantly affecting the quality of the human environment.

20        41. Defendants prepared an EA for the Project.  Pursuant to 40 C.F.R. § 1508.9(a)(1)

21 (2019), an EA must contain sufficient evidence and analysis for determining whether to

22 prepare an environmental impact statement or a finding of no significant impact.  In the

23 alternative, under 40 C.F.R. § 1501.5(c) (2020), an EA shall briefly provide sufficient

24 evidence and analysis for determining whether to prepare an environmental impact statement

COMPLAINT                                                    11

1    or a finding of no significant impact, including a discussion of the purpose and need for the

2    proposed action, alternatives as required by section 102(2)(E) of NEPA, and the

3    environmental impacts of the proposed action and alternatives.

4        42. Under 40 C.F.R. § 1508.27 (2019), which lists the regulatory factors used to

5    determine significance, the environmental impacts of the project are significant.  In the

6    alternative, according to 40 C.F.R. §§ 1501.3(b)(1) and (2) (2020), to determine whether the

7    effects of the proposed action are significant, agencies shall analyze the potentially affected

8    environment and degree of the effects, as well as short- and long-term effects, beneficial and

9    adverse effects, effects on public health and safety, and effects that would violate Federal,

10   State, Tribal, or local law protecting the environment.  The affected environment and degree

11   of the effects, as set forth below, make this Project significant.

12       43. Defendants' authorization of the Project without preparing an EIS violates NEPA

13   because the Project is a major federal action significantly affecting the quality of the human

14   environment.

15       44. The Project is significant under 40 C.F.R. § 1508.27(b)(1) (2019) because the

16   project may result in significant adverse environmental impacts, including increased

17   congestion resulting in increased air pollution and greenhouse gases, and decreased safety for

18   along the freeway and on City streets.

19       45. The Project is significant under 40 C.F.R. § 1508.27(b)(2) (2019) because the

20   Project will increase the adverse environmental impacts associated with public health and

21   safety.  While the project proposes to increase safety, the Project will jeopardize the safety of

22   children and staff at the Harriet Tubman middle school by widening the highway

23   immediately adjacent to the school and increasing the capacity of the highway to

24

COMPLAINT                                                                           12

1  accommodate greater traffic loads.  That traffic will, in turn, increase air pollution and

2  greenhouse gases.  The Project will also decrease safety along the freeway and on City

3  streets.  The Project will also create a roadway capable of accommodating additional lanes of

4  traffic beyond what is proposed for the Project, and the adverse impacts of that increase in

5  capacity was not analyzed or disclosed in the EA.

6       46. The Project is significant under 40 C.F.R. § 1508.27(b)(3) (2019) because the

7  project will significantly affect unique characteristics of the geographic area.  Not only is

8  Harriet Tubman middle school located immediately adjacent to the Project but the project

9  will increase the proximity of the highway to the middle school.

10      47. The Project area is also home to a number of notable Black–owned businesses

11  and civic organizations. Bill Webb Elks Lodge, a property associated with Black history in

12  NE Portland, is in the project area and is pending nomination for the National Register of

13  Historic Places. The Urban League of Portland, one of the Portland Black community's

14  principal advocacy and service organizations, is located within the Project area.

15      48. The Project is significant under 40 C.F.R. § 1508.27(b)(4) (2019) because the

16  effects to the Project are highly controversial.  The agencies' analysis of air quality,

17  transportation impacts, noise impacts, climate emissions, and so forth are contingent upon the

18  transportation modeling, much of which has been kept from the public's scrutiny.  For the

19  modeling that has been disclosed, the agencies misused the modeling data by, including but

20  not limited to, adopting a modeling strategy and assumptions that are at odds with the best

21  available science on the effects of induced demand.  The agencies also erroneously relied

22  upon assumptions related to vehicle fleet composition and turnover, amongst other

23  assumptions, to artificially reduce emissions.

24

COMPLAINT                                                                                   13

1    49. The Project is significant under 40 C.F.R. § 1508.27(b)(5) (2019) because the

2    effects on the human environment are highly uncertain.  The agencies' analysis of air quality,

3    transportation impacts, noise impacts, climate emissions, and so forth are contingent upon the

4    transportation modeling, much of which has been kept from the public's scrutiny.  For the

5    modeling that has been disclosed, the agencies misused the modeling data by, including but

6    not limited to, adopting a modeling strategy and assumptions that are at odds with the best

7    available science on the effects of induced demand.  The agencies also erroneously relied

8    upon assumptions related to vehicle fleet composition and turnover, amongst other

9    assumptions, to artificially reduce emissions.

10    50. The Project is significant under 40 C.F.R. § 1508.27(b)(6) (2019) because the

11    project may establish a precedent for future actions with significant effects.  The agencies

12    have included the roughly $3 billion Columbia River Crossing Project (also known as the

13    Interstate Bridge Replacement program) within the alleged baseline.  The Columbia River

14    Crossing Project is a 12-lane-wide, five-mile-long freeway widening project located

15    approximately three miles north of the Project. If the Project is approved as an EA and

16    assumes the existence of the Columbia River Cross Project, then the Columbia River

17    Crossing, if it is ever actually re-initiated, may be considered as insignificant under NEPA,

18    when it certainly is not.

19    51. The Project will create a roadway capable of accommodating additional lanes of

20    traffic beyond what is proposed for the Project.  If additional lanes of traffic are proposed in

21    the future, the widening here will set a precedent and more likely result in additional lanes of

22    traffic, the direct and indirect effects of which have not been analyzed or disclosed, including

23    the impacts from traffic, noise, and pollution.

24

COMPLAINT                                                                                   14

1    52. The Project is significant under 40 C.F.R. § 1508.27(b)(7) (2019) because the

2    agencies have misconstrued the project's cumulative impacts.  The Columbia River Crossing

3    is a reasonably foreseeable project but the agencies failed to prepare a cumulative impacts

4    analysis for the Columbia River Crossing.  Congestion pricing (also known as value pricing

5    or tolling) is also a reasonably foreseeable project that was planned and programmed by

6    Oregon legislature to require that it be planned and implemented along I-5 and Interstate 205

7    (I-205).  Defendants, however, failed to prepare a cumulative impacts analysis for congestion

8    pricing.

9    53. The Project is significant under 40 C.F.R. § 1508.27(b)(8) (2019) because the

10    action may adversely affect highways and culturally historic areas.  The effect of the project

11    will be adverse by increasing capacity of the highway, which will be filled by induced

12    demand, commonly known as the "fundamental law of road congestion."  The agencies also

13    erroneously relied upon assumptions related to vehicle fleet composition and turnover,

14    amongst other assumptions, to artificially reduce emissions.  The effect of the project will

15    also adversely affect a number of notable pillars of Portland's Black community, including

16    the Bill Webb Elks Lodge, the Urban League of Portland, the Harriet Tubman Middle

17    School, and Lillis-Albina Park.

18    54. The Project is significant under 40 C.F.R. § 1508.27(b)(10) (2019).  The project

19    threatens to violate Federal, State, and local law, including Section 4(f) of the Transportation

20    Act, Executive Order 12898, Governor Brown's Executive Order No. 20-04, as well as local

21    land use laws and plans.

22

23

24

COMPLAINT                                                                                                    15

1    55. Defendants' actions as described above are arbitrary, capricious, not in

2  accordance with law, and without observance of procedures required by law, within the

3  meaning of the APA, 5 U.S.C. § 706.

4    56. Plaintiffs are entitled to its reasonable fees, costs, and expenses associated with

5  this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

6                **Count II**

7  **Failure to Take a Hard Look at the Project's Direct, Indirect, and Cumulative Impacts**

8    57. Plaintiffs incorporate by reference ¶¶ 1-38 and 55-56.

9    58. Pursuant to 42 U.S.C. § 4332(2)(C)(i)-(ii); 40 C.F.R. §§ 1508.7, 1508.8 (2019),

10  NEPA requires federal agencies to analyze the foreseeable environmental impacts, including

11  direct, indirect, and cumulative impacts (including past, present, and reasonably foreseeable

12  actions) of major federal actions, as well as actions by state and local authorities.

13    59. In the alternative, Federal agencies must consider relevant environmental

14  information and ensure that the public has been informed regarding the decision-making

15  process, pursuant to 40 C.F.R. § 1500.1 (2020).  Agencies must identify environmental

16  effects and values in adequate detail so the decision maker can appropriately consider such

17  effects and values alongside economic and technical analyses, under 40 C.F.R. §

18  1501.2(b)(2) (2020).  Pursuant to 40 C.F.R. § 1508.1(g) (2020), effects or impacts include

19  changes to the human environment from the proposed action or alternatives that are

20  reasonably foreseeable and have a reasonably close causal relationship to the proposed action

21  or alternatives, including those effects that occur at the same time and place as the proposed

22  action or alternatives and may include effects that are later in time or farther removed in

23

24

COMPLAINT                     16

1   distance from the proposed action or alternatives.  Effects also include ecological, aesthetic,

2   historic, cultural, economic social, or health effects.

3       60. *Inadequate Analysis of the No-Build Alternative and the Environmental Baseline.*

4   Defendants failed to take a hard look at the no-build alternative and the environmental

5   baseline.  The agencies misconstrued the levels of traffic in the no-build alternative by

6   improperly inflating traffic levels and producing higher estimates of congestion than would

7   actually occur.  The agencies misconstrued and misapplied models and modeling data.  The

8   agencies failed to disclose and document the Project's traffic projections.  The agencies

9   misconstrued the no-build alternative by including non-existing traffic from the as-of-yet

10   unbuilt Columbia River Crossing, which adds tens of thousands of imaginary vehicles and

11   their fictitious emissions (and other impacts).

12       61. The agencies misconstrued the traffic data used for the Project.  The Project

13   assumes that the Columbia River Crossing, a 12-lane-wide, five-mile-long freeway project

14   was built in 2015, but the agencies failed to substantiate or disclose their assumptions for

15   modeling and estimates of traffic levels generated by the Columbia River Crossing.

16       62. The agencies failed to include average daily traffic for the build and no-build

17   scenarios, one of the most commonly used metrics of traffic volume.

18       63. *Direct and indirect impacts.*  Defendants failed to take a hard look at the direct

19   and indirect impacts of the project.

20       64. The agencies misconstrued the traffic estimates for the build alternative by

21   understating their traffic levels.  The agencies relied upon conclusory assumptions and

22   discredited theories for carbon emissions, which understate carbon emissions.

23

24

COMPLAINT                                                                                    17

65. The agencies failed to adequately consider the impacts to pedestrian, bicycle, and transit transportation.  For pedestrian, bicycle, and transit transportation, the Project will slow travel time, increase grade, and create unsafe conditions.

66. Contrary to the scientific literature and documented impacts of widening freeways, including I-5, the agencies failed to consider the impact of induced demand, the phenomenon by which increases in highway capacity in urban areas generate additional travel that leads to a recurrence of congestion at even higher levels of traffic.  Increased congestion will lead to increased pollution and greenhouse gases.  Not only will the project create greater emissions from increased congestion but the widening will also reduce the distance between the highway and the Harriet Tubman Middle School and its outdoor play area.  Moreover, the agencies erroneously relied upon assumptions related to vehicle fleet composition and turnover, amongst other assumptions, to artificially reduce emissions.

67. The agencies' analysis improperly assumes that build and no-build alternative will have no impact on the pattern and intensity of traffic over the coming decades.

68. The Project may create new urban land within the City of Portland through the use of freeway lids with the possibility of supporting structures and other uses.  The agencies, however, failed to address or analyze the environmental impacts of creating new urban land and uses within the Project area.

69. The Project will create a roadway capable of accommodating additional lanes of traffic beyond what is proposed for the Project.  The EA obfuscates the actual width of the road, but estimates and agency documents indicate a roadway as wide as 160-feet, almost double the existing width of 82-feet.  The agencies failed to analyze the direct and indirect

COMPLAINT                                                                                        18

1    effects of such a significant widening of the roadway and an increase in roadway capacity,

2    including the impacts from traffic, noise, and pollution.

3        70. The agencies failed to take a hard look at the environmental and economic

4    impacts of diverting money from other projects in the Portland-Vancouver metropolitan area,

5    and, instead, proposed to use almost $800 million for the Project at issue.

6        71. *Cumulative impacts.*  Defendants failed to take a hard look at or adequately

7    analyze the cumulative effect of past, present, and foreseeable projects.  the agencies have

8    misconstrued the project's cumulative impacts.  The Columbia River Crossing is a

9    reasonably foreseeable project but the agencies did not prepare a cumulative impacts analysis

10    that included the Columbia River Crossing.

11        72. Congestion pricing (or value pricing) is a reasonably foreseeable action,

12    authorized and mandated by the Oregon legislature, the City of Portland, and the Metro

13    Regional Government, for which the agencies failed to prepare a cumulative impacts

14    analysis.

15                            **Count III**

16    **Failure to Analyze All Reasonable Alternatives and an Adequate Range of Alternatives**

17        73. Plaintiffs incorporate by reference paragraphs ¶¶ 1-38 and 55-56.

18        74. In both an EA and an EIS, NEPA requires the agency to study, develop and

19    describe appropriate alternatives to recommended courses of action in any proposal which

20    involves unresolved conflicts concerning alternative uses of available resources, pursuant to

21    42 U.S.C. § 102(2)(E).

22

23

24

COMPLAINT                                                                19

1    75. Further, agencies shall rigorously explore and objectively evaluate all reasonable

2    alternatives, and for alternatives, which were eliminated from detailed study, briefly discuss

3    the reasons for their having been eliminated, pursuant to 40 C.F.R. § 1502.14(a) (2019).

4    76. In the alternative, pursuant to 40 C.F.R. § 1501.2(b)(3) (2020), Federal agencies

5    must study, develop, and describe appropriate environmental alternatives to recommended

6    courses of action in any proposal that involves unresolved conflicts concerning alternative

7    uses of available resources.  Under 40 C.F.R. § 1508.1(z) (2020), reasonable alternatives

8    mean a reasonable range of alternatives that are technically and economically feasible, meet

9    the purpose and need for the project, and where applicable, meet the goals of the applicant.

10    77. For the Project, the agency only considered two alternatives:  build and no-build.

11    78. The agencies failed to consider, in detail, an alternative that would not require

12    hundreds of millions of dollars in public financing and still satisfy the purpose and need of

13    the Project.  Fiscal conservative alternatives raised by Plaintiffs but not considered in detail

14    include congestion pricing, lane closures, transit alternatives, a reduced or narrowed right-of-

15    way, and alternatives that do not include increasing the capacity of the freeway and the

16    expenditure of hundreds of millions of dollars.

17    79. Congestion pricing uses the power of the market to reduce the waste associated

18    with traffic congestion.  Premium charges during periods of peak demand would encourage

19    road users to eliminate lower-valued trips, take them at a different time, or choose alternative

20    routes or modes of transportation.  As part of the same legislation that provided funding for

21    the Project, the Oregon legislature also directed ODOT to pursue tolling within the corridor.

22    According to the FHWA, there is a consensus among economists that congestion pricing

23    represents the single most viable and sustainable approach to reducing traffic congestion.

24

1   The City of Portland Central City Plan also directs ODOT to implement congestion pricing.

2   Aside from avoiding a costly expansion, congestion pricing can also generate revenue.

3       80. The agency also failed to consider, in detail, a fiscally conservative alternative to

4   implement ramp closures at certain times throughout the day to allow traffic to flow without

5   interruption from incoming motorists.  The agencies acknowledge that close interchanges are

6   a root cause of the issues the Project purports to address.

7   **SECOND CLAIM FOR RELIEF**

8   **Violation of Transportation Act and the APA**

9   **Failure to Satisfy the 4(f) criteria**

10       81. Plaintiffs incorporate by reference ¶¶ 1-38 and 55-56.

11       82. Section 4(f) of the Transportation Act, 49 U.S.C. § 303 identifies the policy of the

12   U.S. Government that special effort should be made to preserve the natural beauty of public

13   parks, recreation lands, and historic sites.

14       83. Pursuant to 49 U.S.C. § 303(c), a transportation project requiring the use of

15   publicly owned land of a public park, recreation area, or historic site of national, State, or

16   local significance is permitted only if there is no prudent and feasible alternative to using that

17   land and the project includes all possible planning to minimize harm to the park, recreation

18   area, or historic site resulting from the use.  No prudent and feasible alternatives exist if the

19   project will have *de minimis* impact on public park, recreation area, and historic sites,

20   pursuant to 49 U.S.C. § 303(d).

21       84. Use of a section 4(f) resource, according to 23 C.F.R. § 774.17, occurs when land

22   is permanently incorporated into a transportation facility, when there is temporary occupancy

23   of land that is adverse in terms of the statute's preservation purpose, pursuant to 23 C.F.R. §

24

COMPLAINT               21

1      774.13(d), or when there is constructive use of a section 4(f) property, pursuant to 23 C.F.R.

2      § 774.15.

3          85. Use of a 4(f) property may not be authorized unless a determination is made that

4      there are no feasible and prudent avoidance alternatives to the use of the land and the action

5      includes all possible planning to minimize harm to the property resulting from such use; or a

6      determination is made that use of the property would have a would have a *de minimis* impact

7      on the property, as defined by 23 C.F.R. § 774.17.  A *de minimis* impact determination must

8      include public notice and opportunity for public review and comment, as well as written

9      concurrence received from the officials with jurisdiction over the property that the project

10     will not adversely affect the activities, features, or attributes that make the property eligible

11     for section 4(f) protection, pursuant to 49 U.S.C. § 303(d).

12         86. The Project will result in construction of a noise wall, to be constructed either on

13     or near Lillis-Albina Park, resulting in the actual occupation and use of the park or

14     constructive use of the park.

15         87. Prudent and feasible alternatives exist using the park, recreation area, or historic

16     site.  The Project does not include all possible planning to minimize harm to the park,

17     recreation area, or historic site.  Defendants' use of the Park will not be *de minimis*.

18     Defendants did not obtain the necessary concurrence from officials with jurisdiction over the

19     property that the adverse effects will be *de minimis*.

20                          **PLAINTIFF'S PRAYER FOR RELIEF**

21         88. WHEREFORE, Plaintiffs respectfully requests that this Court enter a judgment in

22     favor of Plaintiffs and issue the following relief:

23         • Declare that Defendant DOT violated NEPA;

24

COMPLAINT                                                                                    22

- Declare that Defendant FHWA violated NEPA;

- Declare that Defendant Everett violated NEPA;

- Declare that Defendant DOT violated the APA;

- Declare that Defendant FHWA violated the APA;

- Declare that Defendant Everett violated the APA;

- Declare that Defendant DOT violated the Transportation Act;

- Declare that Defendant FHWA violated the Transportation Act;

- Declare that Defendant Everett violated the Transportation Act;

- Declare that Defendants must prepare an Environmental Impact Statement due to the Project's significant effects;

- Declare that the actions of Defendants as set forth in this complaint are arbitrary, capricious, an abuse of discretion, are not in accordance with law and are without observance of procedures required by law and therefore must be set aside pursuant to the APA, 5 U.S.C. § 706(2);

- Vacate and remand the FONSI and REA;

- Enjoin Defendants DOT and FHWA from implementing the Project until Defendants have complied with NEPA, the APA, and the Transportation Act;

- Award Plaintiffs their reasonable attorney fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 or other authority; and

- Grant Plaintiffs such additional and further relief as the Court deems just and equitable.

COMPLAINT                                                                                         23

1    Respectfully submitted this 2nd day of April 2021,

2

3                              /s/ Sean T. Malone
                              Sean T. Malone (OR Bar No. 084060)
4                              Attorney at Law
                              259 E. 5th Ave., Ste. 200-C
5                              Eugene, OR 97401
                              Tel. (303) 859-0403
6                              seanmalone8@hotmail.com

7                              /s/ Mike Sargetakis
                              Mike Sargetakis (OR Bar No. 174607)
8                              mike@oxbowlaw.com
                              /s/ Doug Hageman
9                              Doug Hageman (OR Bar No. 173654)
                              doug@oxbowlaw.com
10                             Oxbow Law Group LLC
                              735 SW 1st Ave, Ste 200
11                             Portland OR 97204
                              Tel. (503) 694-9361

12                             /s/ Karl G. Anuta
                              Karl G. Anuta (OR Bar No. 861423)
13                             Law Office of Karl G. Anuta PC
                              735 SW 1st Ave, 2nd Fl.
14                             Portland, OR 97204
                              Tel. (503) 827-0320
15                             kga@integra.net

16                             *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

COMPLAINT                                                    24